JUDGE SULLIVAN          08 CV 4274

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JOSE GARCIA, RANDY GARCIA,           )
and JOSE GARCIA, JR.,                )
Individually, and                    )
LEONIDAS GARCIA and ELI RIVERA,      )
by their guardian ANA ORTEGA,        )
                                     )
         Plaintiffs,                 )
                                     )
              v.                     )
                                     )
THE CITY OF NEW YORK,                )
DETECTIVE ANTHONY PEZZULLO,          )
ADA CURTIS FARBER,                   )
ADA WILLIAM ZELENKA, and             )
JOHN AND JANE DOES #1-10,            )
                                     )
         Defendants.                 )
_____)



RECEIVED
MAY 0 6 2008
U.S.D.C. S.D.N.Y.
CASHIERS

### COMPLAINT AND JURY DEMAND

Plaintiffs Jose Garcia, Randy Garcia, Jose Garcia, Jr., individually, and Leonidas Garcia

and Eli Rivera, individually and by their guardian Ana Ortega, by and through their attorneys,

the law firm of Cochran Neufeld & Scheck, LLP, state as follows:

### INTRODUCTION

1. Jose Garcia spent over 16 years in prison for a Bronx murder he did not commit.

Tragically, the suffering of Mr. Garcia and his family could and should have been avoided but

for the intentional misconduct of the police and assistant district attorneys who investigated the

case. Evidence of Mr. Garcia's innocence was known to the police and prosecutors at the time

of Mr. Garcia's initial prosecution. Mr. Garcia was only convicted because a confluence of

unconstitutional and tortious behavior by these government actors, acting individually and in

1

concert, kept this evidence from the jury. New York Police detectives employed coercion and direct suggestion which caused a witness' misidentification of Mr. Garcia, the sole evidence against him, and ignored or buried this and other exculpatory evidence. Bronx County prosecutors, as part of a pattern and practice of unconstitutional behavior, misrepresented and hid the results of their investigation into Mr. Garcia's airtight alibi – that he was in the Dominican Republic at the time of the crime – and otherwise deprived him of a fair trial.

2.  To prove his innocence, Mr. Garcia's wife, Ana Ortega, moved with their four sons from the Dominican Republic to the United States. In addition to her tireless, consistent efforts to exonerate Mr. Garcia, Ms. Ortega bravely struggled to establish a life in the United States, working as a teacher's assistant, raising their four sons on her own, and eventually earning citizenship for herself and her children. Although Mr. Garcia stayed involved in raising his sons as best he could through constant phone contact with Ms. Ortega, all four boys suffered immeasurably from their father's absence. Nevertheless, they worked hard to succeed in the United States. The boys attended selective public schools and prestigious private schools on scholarship, including Phillips Andover and Trinity College in Connecticut, where the oldest is now a sophomore. At the same time, Mr. Garcia tirelessly worked from prison to establish his innocence. As he learned English and gained familiarity with the legal system, Mr. Garcia filed motion after motion on his own.

3.  After many years, Hon. Lewis Kaplan of the Southern District of New York saw merit in Mr. Garcia's pro se filings and appointed Willkie Farr & Gallagher LLP pro bono counsel. In 2006, lawyers from Willkie Farr finally succeeded in proving what the police and prosecutors knew or should have known all along – that Mr. Garcia had been in the Dominican Republic at

the time of the murder, and therefore was innocent of the crime for which he had by then spent

over 16 years in prison. Mr. Garcia's release from prison was bittersweet, as he was

immediately deported to the Dominican Republic, and thus largely separated again from his

family. Despite these additional setbacks, Mr. Garcia has worked since his release to reconnect

with and guide his family, who were separated from him for so many years.

## JURISDICTION

4.  This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims

arising under 42 U.S.C. § 1983.

5.  Supplemental jurisdiction over Plaintiffs' pendent state law claims exists pursuant to

28 U.S.C. § 1367(a).

6.  Plaintiffs have complied with the requirements of New York General Municipal Law

Section 50-I by making and serving a notice of claim on the Comptroller of the City of New

York on May 9, 2007, within the time required by New York General Municipal Law Section

50-e. More than thirty days have elapsed since the service of that notice, and no offer of

settlement has been made.

7.  At the request of the City of New York, Plaintiff Jose Garcia submitted to a hearing

pursuant to New York General Municipal Law Section 50-h.

## VENUE

8.  Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New

York, the judicial district in which the claims arose.

## JURY DEMAND

9.  Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs

request a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

10.  Plaintiff Jose Garcia is a citizen of the Dominican Republic.  At all times relevant to this Complaint he was a resident of the State of New York.  He currently lives in Mantanzas, Dominican Republic.

11.  Plaintiff Randy Garcia is and was at all times relevant to this Complaint a resident of the State of New York.  Randy Garcia is Jose Garcia's son and currently lives in Bronx, New York.  He is a sophomore at Trinity College in Connecticut.

12.  Jose Garcia, Jr., is a resident of the State of New York.  Jose Garcia, Jr. currently lives with his mother, Ana Ortega, in Bronx, New York.  Jose Garcia, Jr. is a senior at University High School in the Bronx.

13.  Plaintiff Ana Ortega is Mr. Garcia's wife and the mother of his four children Randy Garcia, Jose Garcia, Jr., Leonidas Garcia, and Eli Rivera.  Ms. Ortega is a citizen of the United States and resides in Bronx, New York.  Ms. Ortega brings suit in her capacity as guardian of her and Mr. Garcia's two minor children, Leonidas Garcia and Eli Rivera, on their behalf.

14.  Leonidas Garcia is a resident of the State of New York.  Leonidas Garcia is Jose Garcia's son and currently lives with his mother, Ana Ortega, in Bronx, New York.  Leonidas is a junior at Manhattan Math & Science Center.

15.  Eli Rivera is a resident of the State of New York.  Eli Rivera is Jose Garcia's son and currently lives with his mother, Ana Ortega, in Bronx, New York.  Eli is a sophomore at Manhattan Math & Science Center.

16.  Defendant Anthony Pezzullo at all times relevant to this Complaint was a duly

appointed and acting police officer of the New York Police Department ("NYPD") with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

17. Defendant Curtis Farber at all times relevant to this Complaint was a duly appointed and acting assistant district attorney ("ADA") in the Bronx County District Attorney's Office ("DA's Office), acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

18. Defendant William Zelenka at all times relevant to this Complaint was a duly appointed and acting assistant district attorney in the Bronx County District Attorney's Office, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

19. Defendant Risa Sugarman at all times relevant to this Complaint was a duly appointed and acting assistant district attorney and head of the homicide division in the Bronx County District Attorney's Office, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

20. Defendants John and Jane Does #1-10, whose actual names plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John and Jane Doe" include individual officers, direct supervisors and

command-level supervisors within the NYPD, who were at all times relevant to this Complaint duly appointed and acting police officers of the NYPD and include officers with responsibilities over the hiring, training, and supervision of NYPD officers, including the individual defendants named herein, acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

21. Defendant City of New York is a municipality that is a political subdivision of the State of New York, was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Bronx County District Attorney's Office.

## FACTS

### The Crime

22. On Tuesday, July 16, 1991, around 11:45 p.m., black men in hooded sweatshirts shot and killed Cesar Vasquez in his courtyard outside 2820 Bailey Avenue in the Bronx, New York.

23. NYPD officers arrived on the scene within minutes, by which time a large crowd had gathered. The officers spoke to a number of witnesses who reported that three black males had shot Cesar Vasquez, jumped into a 4-door black or dark blue Chevy, made a U-turn on Bailey Avenue, and sped away.

24. Detective Anthony Pezzullo, the lead detective, obtained statements from at least three eyewitnesses:

a.     Teenaged J.G.[1], who had been sitting on a parked car just in front of the courtyard at the time of the shooting and was the closest witness. J.G. stated he had seen the car drive up, had seen black males in hooded sweatshirts exit the passenger side of the car and follow the victim into the courtyard of the building, heard the shots and then saw the men flee the scene and return to the dark car. J.G. agreed to cooperate with the police and view photos.

b.     C.M., another teenager who had been with J.G., had seen two black males in hooded sweatshirts follow the victim from 229th street, and had heard several shots. He then saw the men run from the courtyard and jump into a waiting double-parked car and drive off.

c.     Irene Jones, who explained she had heard the shots and seen men in hooded shirts run from the building and jump into a dark car, make a U-turn on Bailey Avenue and flee south.

25.  As described more fully below, and despite the fact that there were at least three eyewitnesses to the shooting, Det. Pezzullo coerced Penny Denor – J.G.'s mother, who Pezzullo knew could not identify any of the actual shooters – into selecting photographs and otherwise identifying suspects suggested to her. Det. Pezzullo accomplished this with threats to revive criminal proceedings against her teenaged son J.G. if Ms. Denor did not cooperate as directed.

26.  Griselda Vazquez, the victim's sister, also witnessed the shooting and was

---

[1]  To protect the privacy of witness J.G., who was a minor at the time of these events, he is identified only by his initials.

interviewed by other officers at the scene.

## Jose Garcia's Alibi

27.  On July 16, 1991, the same day that the murder of Cesar Vasquez took place in the Bronx, New York, Jose Garcia was in jail in the Dominican Republic; he would remain in that country until more than a week after the murder.

28.  Mr. Garcia had grown up in the Dominican Republic, where he graduated from a technical high school.  He married Ana Ortega and worked as an industrial mechanic.

29.  Mr. Garcia had initially come to the United States in 1988 to earn more money.  He lived in the Bronx, where he also had some family, and would periodically return to the Dominican Republic.

30.  On June 22, 1991, Jose Garcia had flown to the Dominican Republic from the Bronx, New York to be with his wife Ana Ortega on their June 27th wedding anniversary, as well as to visit their children Randy Garcia, Jose Garcia, Jr. and Leonidas Garcia.

31.  After a three-week visit, Mr. Garcia prepared to go back to the United States.  On July 15, 1991, Ms. Ortega and a friend, Luisito, dropped Jose Garcia off at La Union International Airport in Puerto Plata, Dominican Republic.  Mr. Garcia attempted to travel to New York on a fraudulent American passport in the name of Ferdinand Caraballo, but customs officials confiscated the passport and Mr. Garcia was arrested and detained overnight.

32.  On July 15, 1991, the Dominican authorities also notified Ana Ortega that Jose Garcia had been detained.  On July 16, 1991, Ms. Ortega traveled back to Puerto Plata with Luisito to post Mr. Garcia's bail.  Because Ms. Ortega had insufficient money on her person to post the bail, Luisito had to return to Ms. Ortega's home in Mantanzas to obtain additional

money, and then bring this money back to Ms. Ortega in Puerto Plata.

33.  Ms. Ortega finally posted bail and Jose Garcia was released from custody at approximately 3:30 to 4:00 p.m. on July 16, 1991.  He returned to Mantanzas with Ana Ortega. That night, along with several dozen relatives, friends and neighbors, they attended prayer services for a family friend, Australia Maria Sanchez, known as Niña, who had died on July 10, 1991.

34.  After the prayer service on July 16, 1991, Jose Garcia and Ana Ortega returned to the house of Ms. Ortega's mother, Isabel Filpo, to sleep.  In the middle of the night, Garcia and Ortega were awakened by their friend Alsacia Encarnacion knocking on their window.  Ms. Encarnacion told them Griselda Vazquez had called her from New York to relay the message that her brother, Cesar Vasquez, had been killed.  Mr. Garcia and Ms. Ortega then drove to Ms. Encarnacion's home to use her telephone.  Mr. Garcia called Griselda and Ms. Ortega overheard Garcia discussing the circumstances of Cesar Vasquez's murder.

35.  Jose Garcia remained with Ana Ortega at Ms. Filpo's house for another several days. Mr. Garcia and Ms. Ortega continued to attend the prayer services for Niña throughout the rest of the nine days of mourning that followed her July 10, 1991 death.

36.  Eventually Jose Garcia obtained a second false passport, this time Panamanian.  Near the end of July, Mr. Garcia left Mantanzas to begin a trip through Panama to the United States. On August 2, 1991, Mr. Garcia arrived in Los Angeles and was arrested for traveling on false documents.

### Pezzullo Manufactures Identifications

37.  Back in New York, within several days after the crime, Detective Pezzullo arranged

for J.G. to come down to the precinct to view photos of potential suspects. When J.G. did not identify anyone and was not fully cooperative, Detective Pezzullo threatened to revive prior criminal charges against him which had been previously resolved.

38. Detective Pezzullo never disclosed to prosecutors or the defense that he had shown photographs to J.G. and that J.G. had not identified anyone as the shooter. Rather, Detective Pezzullo misrepresented to prosecutors before trial and again at trial that he had never shown photographs to J.G. or, for that matter, to any other witness but Ms. Denor. Detective Pezzullo also hid from prosecutors and the defense that he had attempted to coerce J.G. into making an identification by threatening to revive criminal charges against him.

39. After threatening J.G. without effect, Detective Pezzullo turned his threats to Ms. Denor. Detective Pezzullo coerced Ms. Denor by threatening to take action against her son if Ms. Denor did not cooperate with the police in identifying suspects that Pezzullo suggested to her.

40. Detective Pezzullo hid from the prosecution and the defense his coercive tactics and that he knew that Ms. Denor could not identify the assailants without suggestion. Additionally, Detective Pezzullo misrepresented to prosecutors before trial and again at trial that he had not threatened Ms. Denor in any way, including specifically denying that he had threatened her son and denying that he had ever shown J.G. photographs.

41. Initially, according to Detective Pezzullo, his investigation into the Cesar Vasquez homicide focused on "King Kong Bundy" and the Felix brothers, a large-scale Puerto Rican drug gang that had been attempting to expand the territory of their drug operations in the Bronx.

42. At the end of August, only a few weeks after threatening Ms. Denor to obtain her

10

compliance, Pezzullo met with Penny Denor in his car for the purpose of showing her photographs of suspects. Pezzullo showed Denor a group of approximately six photographs, including, according to Pezzullo, the Felix brothers. Pezzullo failed to document this identification procedure, failed to maintain the photographs shown, and failed to document or report Denor's ability or inability to make an identification.

43. Around Labor Day, according to Pezzullo, he shifted the focus of the Vasquez murder investigation to Jose Garcia and Carlos Morillo. Pezzullo did so even though they did not fit the description given by the many eyewitnesses to the crime. In particular, Mr. Garcia is a light-skinned Latino, while the many witnesses – including, according to Pezzullo, Ms. Denor – had described the assailants as black males. Pezzullo did not document or report what caused the shift in his investigation.

44. On September 26, 1991, Det. Pezzullo again contacted Penny Denor for the specific purpose of having her view photographs. While again meeting in his car, Pezzullo presented Denor photographs of suspects, just as he had done with the Felix brothers. This time the photographs included Carlos Morillo and Jose Garcia. Pezzullo did not document or report this improper displaying of individual photographs to the prosecutor before trial or during his pretrial or trial testimony. Rather, Pezzullo denied that Ms. Denor saw any photographs in his car that day.

45. Right after displaying the photographs to Ms. Denor in his car, and even though Pezzullo knew that Ms. Denor could not identify any of the actual assailants, Pezzullo took Penny Denor to view photographs at the catch unit. Furthermore, although the actual eyewitnesses had consistently described the assailants as three black males in hooded

11

sweatshirts, Pezzullo had Denor look at photographs of male Hispanics, including Carlos Morillo and Jose Garcia, his new suspects.

46. In connection with the photographic identification procedures on September 26, 1991, Pezzullo used suggestion to induce Ms. Denor to select photographs of Jose Garcia and Carlos Morillo. These suggestive techniques included showing photographs of these men to Ms. Denor before she viewed photographs at the catch unit, as well as coercing or threatening Ms. Denor to identify these men in exchange for protecting her son, J.G. Neither the photographs shown and selected during the September 26, 1991 identification procedures nor the identification statements by Ms. Denor were documented or provided to the prosecutor.

47. Det. Pezzullo later reported to prosecutors before trial that Penny Denor had independently positively identified Morillo and Garcia as the assailants. This report was a fabrication. Pezzullo did not disclose to the prosecutor or defense that Ms. Denor could not and did not independently identify the shooters, or that he used suggestion and coercion to induce Ms. Denor to identify Garcia and Morillo. Rather, Pezzullo misrepresented the circumstances of the alleged identifications, including the photographs viewed and the photographs selected, in pretrial reports to the prosecutors as well as in his testimony at the Wade hearing and at trial.

48. Pezzullo further represented and later testified that no witnesses other than Ms. Denor viewed photographs. Pezzullo thus hid from and misrepresented to the prosecutors and defense that he had shown photographs to J.G., who did not identify anyone as the assailants. Upon information and belief, Det. Pezzullo also hid from and misrepresented to the prosecutors and defense additional identification procedures he conducted with eyewitnesses other than J.G. and Ms. Denor, and which produced exculpatory information.

12

49. On October 3, 1991, Det. Pezzullo met with Gabriella Pena, a friend of Jose Garcia and Cesar Vasquez, and Bronx ADA Carol Sharpe, for whom Ms. Pena was then working as an informant and government witness in a different prosecution. Det. Pezzullo used Ms. Pena as a source for his investigation, including by showing her photographs of suspects in his car, just as he had twice before with Penny Denor. The photographs shown to Ms. Pena included photos of Mr. Morillo, Jose Garcia and Jose Garcia's brother and brother-in-law.

50. Among other things, Ms. Pena told Det. Pezzullo that Jose Garcia had been in the Dominican Republic during the entire month of July, 1991, and therefore could not have committed the Vasquez murder.

51. On October 17, 1991, Det. Pezzullo conducted a live six person line-up, consisting of Mr. Morillo and five fillers, for Ms. Denor. The only people present in the viewing room were Det. Pezzullo and Ms. Denor; no assistant district attorney or defense attorney observed the line-up. Det. Pezzullo later reported that Ms. Denor independently and positively identified Mr. Morillo at this line-up. This report was a fabrication. Any identification Ms. Denor made was the result of Det. Pezzullo's suggestion and coercion in connection with the line-up. Pezzullo did not disclose to the prosecutor or defense the suggestion he used to induce Ms. Denor to identify Morillo, including showing Ms. Denor photographs in his car. Rather, Pezzullo misrepresented the circumstances of the line-up in reports to the prosecutors as well as in his testimony at the Wade hearing and at trial.

52. On October 22, 1991, ADA Curtis Farber was assigned to the case by his supervisor, ADA Risa Sugarman. That day, he was briefed on the case by ADA Sugarman, who had previously interviewed Ms. Denor. ADA Farber also reviewed the police reports and

13

interviewed Penny Denor himself.

53. No physical or forensic evidence – not blood, hair, fingerprints, ballistics or anything else – linked Mr. Garcia or Mr. Morillo to the Vasquez shooting. Although many people had witnessed the shooting, Mr. Garcia, in particular, did not fit the contemporaneous description given by these eyewitnesses and no one besides Ms. Denor was even alleged to have made any identification of Mr. Garcia or Mr. Morillo. The case against Mr. Garcia and Mr. Morillo depended entirely on Penny Denor.

54. Even after coaching from Det. Pezzullo, and putting aside that Ms. Denor only identified Garcia and Morillo through coercion and suggestion which were hidden from the prosecutor and defense, Ms. Denor was an incredibly poor witness. Even by her own, inherently unreliable testimony, Ms. Denor had only seen the shooters for a few seconds, at night, from her fourth floor window. Ms. Denor was making the least reliable type of identification – a cross-racial identification of strangers. She had been on psychotropic medication both on the night of the crime and during all of the identification procedures, including, at the time of the identification, Thorazine, and stated that she did not remember what happened that night because she had tried to block it out. Most importantly, Ms. Denor could not tell a consistent story of what she had seen or give a coherent description of the shooters. Her identifications of Mr. Garcia and Mr. Morillo contradicted the description of the perpetrators by all of the eyewitnesses, including the initial description attributed to her by Pezzullo.

55. On October 22, 1991, ADA Farber obtained indictments of both Morillo and Garcia for the Vasquez murder. Jose Garcia was then extradited from California, where he was still being detained for entering the country on a false passport, to New York.

14

56. Jose Garcia's arrest and indictment for the Vazquez murder were based solely on Ms. Denor's identification of him, which itself was the result of Detective Pezzullo's coercion and suggestion. Ms. Denor's identifications were solely the result of improper coercion and suggestion and provided no basis for probable cause that Jose Garcia committed the crime.

57. Detective Pezzullo continued his efforts to make the case by any means necessary after Mr. Garcia's arraignment.

58. On December 11, 1991, Det. Pezzullo conducted a live six person line-up, consisting of Jose Garcia and five fillers, for Ms. Denor. Present in the viewing room were Detective Pezzullo, Detective Morelli, ADA Curtis Farber, Penny Denor, Jose Garcia's then-lawyer Osvaldo Gonzalez, and a stenographer. At the line-up, Denor positively identified one of the fillers after almost selecting a different filler.

59. Det. Pezzullo later reported that immediately after they left the line-up room, when Ms. Denor and he were alone, Ms. Denor spontaneously told him that she had picked the wrong person out of the line-up, that she had done so because she was afraid, and that she knew that the correct person was the person in seat #5, Jose Garcia. This report was a fabrication. Any identification Ms. Denor made was the result of Det. Pezzullo's suggestion and coercion in connection with the line-up. Furthermore, Pezzullo did not disclose to the prosecutor and defense the suggestion he used to induce Ms. Denor to identify Garcia. Rather, Pezzullo misrepresented the circumstances of the line-up in reports to the prosecutors as well as in his testimony at the Wade hearing and at trial.

**District Attorneys Fabricate and Suppress the Results of their Alibi Investigation and Engage in Other Prosecutorial Misconduct**

60. From the time of his arrest, both Mr. Garcia and Ana Ortega consistently asserted Mr.

Garcia's innocence.  More specifically, each asserted that Mr. Garcia was in the Dominican

Republic with her and their sons on the day of and continuing many days after the murder, and

thus could not have committed the crime.  Ana Ortega had family members collect certified

documents in the Dominican Republic, establishing that Mr. Garcia had been in jail in that

country on July 16, 1991 and was not even released from custody until approximately 4:00 p.m.

on the day of the murder.  Ms. Ortega provided these documents to Mr. Garcia's attorney, Jorge

Guttlein, who passed them on to the ADA's on the case in or about February 1991 so they could

conduct an independent investigation into Garcia's alibi and his claim of innocence.

     61.  Rather than pass this critical information on to the police to investigate, ADA Farber,

his supervisor ADA Sugarman and later ADA William Zelenka, who at some point took over the

prosecution from ADA Farber, assured Mr. Garcia, his attorney and the court that they would

and in fact did investigate Mr. Garcia's claims of innocence.  In addition to the certified

Dominican documents, Farber, Sugarman and later Zelenka knew that Mr. Garcia's alibi – that

he was in the Dominican Republic with Ana Ortega and their three sons at the time of the murder

– was corroborated by both Gabriella Pena, who was working as an informant for Bronx ADA

Carol Sharpe in a different prosecution, and the fact that Mr. Garcia was arrested in Los Angeles

on August 2, 1991, for attempting to enter the United States on a false passport.

     62.  Beginning in March and continuing through 1992, ADA's Farber and/or Zelenka,

with approval and/or participation of Sugarman, investigated this evidence which demonstrated

that  Jose Garcia was in Dominican Republic at the time the murder was committed and was

actually innocent of the crimes for which he was charged. ADA Farber acknowledged that this

investigation was being conducted specifically in connection with determining whether Garcia

should remain in custody.

63. In March, 1992, for example, ADA Farber contacted the State Department. The State Department confirmed that Jose Garcia had been arrested in the Dominican Republic on July 15, 1991 for traveling on false documents.

64. Upon information and belief, Farber and Zelenka, with Sugarman's approval, took further investigative steps all of which confirmed that Mr. Garcia remained in custody until approximately 4:00 p.m. on July 16 and thus could not plausibly have committed the murder in New York later that evening. The DA's Office, unlike Mr. Garcia, was in a unique position to obtain documents and other evidence from foreign officials demonstrating the validity of Mr. Garcia's alibi.

65. The DA defendants knew, or in absence of their deliberate and conscious-shocking indifference should have known, that this evidence eviscerated probable cause to detain or prosecute Mr. Garcia.

66. Nevertheless, the documents from the State Department were not disclosed to Jose Garcia, his attorney, or the court at any time prior to his trial or conviction.

67. Instead, ADA Zelenka misrepresented the results of his investigation into Mr. Garcia's alibi, falsely stating not only that neither the American nor the Dominican authorities could confirm Mr. Garcia's arrest, but that ADA Farber was notified that the police department in Santiago reported that there was no arrest.

68. Once in possession of this clearly exonerative evidence, to the extent any question remained about Mr. Garcia's whereabouts on July 15, 1991, defendants failed to conduct additional investigation that would have further confirmed Mr. Garcia's innocence. This

17

included failing to interview alleged eyewitnesses and alibi witnesses, many of whom remained available even 15 years later when located by Mr. Garcia's habeas lawyers from Willkie Farr.

69. After this shocking representation, defense counsel specifically requested documentation of the investigation and the trial court directed that such documents be produced by ADA Zelenka.

70. Despite having in his possession a document from the United States State Department that directly supported Mr. Garcia's alibi, and which he admitted would not be accessible to the defense attorneys, ADA Zelenka feigned ignorance about whether such a document even existed. In violation of the court's order, Zelenka did not produce to the court or the defense the documentation he had in his possession, and which directly contradicted the representation he had made in court. Upon information and belief, the ADA defendants had obtained and failed to disclose other evidence supporting Mr. Garcia's alibi.

**All Defendants Intentionally Interfered with Mr. Garcia's Family Relationships**

71. Jose Garcia and Ana Ortega were integrally involved in attempting to prove Mr. Garcia's innocence throughout the investigation and each of the defendants was aware of Mr. Garcia's family relationships. The Defendants' misconduct in this case was directed, at least in part, to interfere with those relationships.

**The Prosecution**

72. The prosecution of Jose Garcia and Carlos Morillo for the Cesar Vasquez murder began in December, 1992.

73. The only evidence implicating Garcia and Morillo in the shooting came from witness Penny Denor, who made an exceptionally weak witness, even without the shocking evidence of

coercion and suggestion contained in this Complaint.  Ms. Denor could not describe the men she

had seen and, initially, could not even identify Morillo in the courtroom.  By her own testimony,

Ms. Denor had only seen the shooters for a few seconds, at night, from her fourth floor window.

She admitted taking psychotropic drugs the night of incident and during all identification

procedures, and that she could not remember the events of the night of the shooting.  Ms.

Denor's testimony suffered from many inconsistencies, including contradicting her own prior

testimony and the testimony of the police officer witnesses multiple times.

74. Detective Pezzullo never disclosed to the prosecution or defense that Ms. Denor

could not identify any of the actual shooters and any identifications she made were solely the

result of his coercion and suggestion.

75. On January 8, 1993, Mr. Garcia and Mr. Morillo were both convicted of Murder in

the Second Degree, pursuant to New York Penal Law § 125.25[1].

76. Each was given the maximum sentence: twenty-five years to life.

**Pattern and Practice of Prosecutorial Misconduct in the Bronx County DA's Office**

77. The acts of misconduct by the prosecutors in this case did not end at the investigative

phase.  During trial and on appeal ADA's continued to engage in prosecutorial misconduct.

78. For example, despite the clear evidence pointing to the innocence of Garcia and

Morillo, ADA Farber, ADA Zelenka and ADA Sugarman failed to investigate the many

inconsistencies between the description of the perpetrators on the night of the crime attributed to

Ms. Denor and her later identifications of Morillo and Garcia or follow up with the additional

witnesses who had witnessed the shooting and had described the assailants as three black men.

79. During Mr. Garcia's criminal trial, after objecting to the admission of any

19

documentary evidence of Mr. Garcia's alibi, Zelenka dismissed the only alibi evidence introduced at trial – the testimony of the victim's sister that she spoke to Jose Garcia in the Dominican Republic by telephone on the night of the murder – as irrelevant because there was no proof she personally dialed the telephone.

80. ADA Zelenka further took the position, contrary to all available evidence and basic common sense, that even if Garcia had been arrested on July 15, 1991, he could easily have returned to New York with 4 ½ hours to spare before committing the murder.

81. In fact, even after Mr. Garcia's habeas attorneys provided mountains of additional evidence demonstrating that Mr. Garcia was arrested on July 15, 1991, remained in custody 20 minutes from the nearest airport until 4:00 p.m. the day of the murder, and could not possibly have boarded a plane for New York (even assuming he made it through the same customs officials who arrested him the previous day) in time to commit the murder, the Bronx DA's Office maintained the same absurd position regarding Mr. Garcia's alibi. Most shockingly, the Bronx DA's Office used this ridiculous theory during Mr. Garcia's habeas proceedings to support their assertion that evidence of Mr. Garcia's arrest in the Dominican Republic was not *Brady* material.

82. The Bronx DA's defending against Mr. Garcia's habeas petition also engaged in improper withholding of evidence in 2005. The DA's hid from Mr. Garcia's lawyers and the court that they had located key witness Gabriella Pena and that her testimony contradicted the ADA's arguments and representations in court.

83. The repeated acts of investigative and prosecutorial misconduct by the Bronx ADA's assigned to this case were anything but aberrational. Beginning long before the events of

this case and continuing long thereafter, the Bronx District Attorney's office maintained

unconstitutional customs, policies and practice of failing to disclose exculpatory and

impeachment evidence, failing to investigate evidence and misrepresenting evidence of

innocence, initiating and maintaining prosecutions without probable cause and failing to provide

minimally adequate training, supervision and discipline to ADA's concerning these most

fundamental responsibilities.

84. Beginning long before 1991 and continuing through at least 2003, there were

numerous judicial findings of misconduct against numerous Bronx ADA's, including at least 11

*Brady* reversals.

85. These reversals, including for example, *People v. Ramos*, 201 Ad.2d 78 (1st Dept.

1994), which involved prosecutorial misconduct beginning in 1985 and continuing through

1994, included judicial admonitions such as

> "In this case, the People's failure to fulfill their obligation to insure that a fair trial
> was had and justice done is inexcusable.   As the motion court eloquently
> observed, "The greatest crime of all in a civilized society is an unjust conviction.
> It is truly a scandal which reflects unfavorably on all participants in the criminal
> justice system"

86. Despite these and many other judicial findings of prosecutorial misconduct, the

Bronx DA's Office failed to provide training, supervision or discipline to remedy widespread

constitutional misconduct by ADA's including the ADA defendants in this case.

87. Even in the face of findings of the clearest *Brady*, *Rosario* and other fundamental

violations by trial courts, the Bronx DA's Office routinely took the position on appeal that no

violations had occurred and that the ADA's had acted properly.

88. Consistent with this public position, the DA's Office failed, as a matter of custom and

practice to meaningfully investigate charges that employees were violating citizen's constitutional rights.  ADA's found to have committed serious misconduct by trial and appellate courts were neither disciplined nor remediated and instead were routinely rewarded with high evaluations from their supervisors.

89.  The policies, procedures and training concerning for example the disclosure of exculpatory evidence were nonexistent or grossly inadequate; there was no disciplinary policy concerning *Brady* violations and as of 2003 no occasion when a prosecutor was disciplined for *Brady* or other violations.

90.  To the extent there was any training or supervision, ADA's were misinformed concerning, among other things, their obligations to disclose exculpatory and impeachments evidence to the defense, and supervisors, including for example defendant Sugarman, who acquiesced and/or participated in the most serious misconduct in this case.

### Exoneration

91.  Mr. Garcia's conviction was affirmed by the Appellate Division, First Department, *People v. Garcia*, 219 A.D.2d 541 (1st Dept. 1995), and the New York Court of Appeals denied leave for further appeal, 88 N.Y.2d 847 (1996).

92.  Mr. Garcia continued to try to establish his innocence, filing a series of motions and petitions pro se.  The Bronx County District Attorney's Office aggressively opposed Mr. Garcia's appeals at every turn.

93.  On September 13, 2004, Hon. Lewis Kaplan of the United States District Court for the Southern District of New York found that Mr. Garcia's pro se petition for a writ of habeas corpus, which presented the documentary evidence of his alibi as well as affidavits from several

alibi witnesses, was an "exceedingly rare case in which the petitioner makes out a credible claim of actual innocence," and therefore deserved further consideration. *Garcia v. Portuondo*, 334 F. Supp. 2d 446 (S.D.N.Y. 2004). Judge Kaplan appointed Martin Klotz, of Willkie Farr & Gallagher LLP, to provide pro bono representation of Mr. Garcia.

94. With the assistance of Mr. Klotz, along with associates Matthew Bosher and Stephen Vogel, Mr. Garcia finally had the opportunity to present the overwhelming evidence of his innocence to a court. Mr. Garcia developed this record in extensive evidentiary hearings before Magistrate Judge Kevin N. Fox, including testimony from Mr. Garcia, alibi witnesses including Ana Ortega, Isabel Filpo and Alsacia Encarnacion, and Mr. Garcia's trial attorney Jorge Guttlein and appellate attorney John Wilson, as well as documentary evidence.

95. After considering all this evidence, and over the vociferous objection of the Bronx County District Attorney's Office, Judge Fox recommended that Mr. Garcia's petition be granted on grounds, including without limitation, that he was actually innocent of the Vasquez murder.

96. On December 21, 2006, Hon. Lewis Kaplan accepted the recommendation of Magistrate Judge Fox and conditionally granted Mr. Garcia's petition for a writ of habeas corpus unless Mr. Garcia was retried within 60 days of that date. *Garcia v. Portuondo*, 459 F. Supp. 2d 267 (S.D.N.Y. 2006).

97. Mr. Garcia was not retried, and on February 22, 2007, Judge Kaplan granted his petition for a writ of habeas corpus.

98. Mr. Garcia was released from the custody of New York State on or about February 28, 2007, when he was transferred to the custody of immigration authorities pursuant to a deportation order that had been entered against him while he was incarcerated.

99.  On May 18, 2007, Justice Michael R. Sonberg of Bronx Supreme Court vacated Mr. Garcia's conviction pursuant to C.P.L § 440.10(1)(g) and (h) and dismissed the indictment against him with prejudice.

100.  After unsuccessful appeals to immigration authorities, on or about June 12, 2007, Mr. Garcia was deported to the Dominican Republic.

### Damages

101.  The actions of the defendants deprived Plaintiff Jose Garcia of his civil rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and the laws of New York.

102.  The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Jose Garcia to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve over sixteen years in jail and prison for a crime he did not commit.  Mr. Garcia also suffered specific physical injuries as a result of his wrongful incarceration, including injuries to his eyes and teeth, tuberculosis, and injuries to his leg as a result of a botched surgery.

103.  In addition, Mr. Garcia suffered the following injuries and damages as a result of defendants' actions, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, athletic opportunity, personal fulfillment, sexual activity,

24

family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

104.  As a direct and proximate result of the acts of the defendants, and the resulting unlawful incarceration of Mr. Garcia, plaintiffs Randy Garcia, Jose Garcia, Jr., Leonidas Garcia and Eli Rivera suffered pecuniary and non-pecuniary damages in that they were deprived of those benefits one would normally derive from the presence of their father, Mr. Garcia.  At the time Mr. Garcia was initially detained for this crime, his sons were 3 ½ years old (Randy Garcia), 2 years old (Jose Garcia, Jr.), and 1 year old (Leonidas Garcia); Ana Ortega was pregnant with their fourth child, Eli Rivera.  As the result of their father's absence, Randy, Jose Jr., Leonidas and Eli suffered the loss of society, companionship, advice, moral support, family services, attention, protection, parental care, and financial support.  They also suffered from mental anguish, bereavement, and the stigma of being the children of a man who was tried and convicted of a cold-blooded murder.

105.  All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## COUNT I
### 42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution
*By Mr. Garcia against Det. Pezzullo and John and Jane Does*

106.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

107.  Defendants Pezzullo and John and Jane Doe police officers, with malice and

knowing that probable cause did not exist to prosecute Mr. Garcia for the murder of Cesar

Vasquez, acting individually and in concert caused Mr. Garcia to be arrested, charged, and

prosecuted for that crime, thereby violating Mr. Garcia's clearly established right, under the

Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable

searches and seizures.

108.  Specifically, the defendants, acting individually and in concert, fabricated evidence

and intentionally withheld from and misrepresented to prosecutors and the grand jury

exculpatory facts that vitiated probable cause against Mr. Garcia, including but not limited to the

fact that Ms. Denor could not independently identify the actual shooters, that her identifications

of Mr. Garcia and Mr. Morillo were the product of unduly suggestive identification procedures,

direct suggestion and coercion, that identification procedures with eyewitnesses other than Ms.

Denor produced exculpatory information, and that the police had fabricated inculpatory

evidence, and withheld and/or destroyed exculpatory evidence.  The defendants also failed to

conduct a constitutionally adequate investigation in light of clear evidence of Mr. Garcia's

innocence, as well as clear evidence pointing to other suspects.

109.  The defendants performed the above-described acts under color of state law,

intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr.

Garcia's clearly established constitutional rights.  No reasonable officer in 1991 would have

believed this conduct was lawful.

110.  As Mr. Garcia has always stated, from the time of his arrest and throughout over

sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder.  The

prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was

vacated and the indictment dismissed.

111.  As a direct and proximate result of defendants' actions Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT II
#### 42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Conducting Unduly Suggestive Identification Procedures, and Withholding Material Exculpatory and Impeachment Evidence
*By Mr. Garcia against Det. Pezzullo and John and Jane Does*

112.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

113.  Defendants Pezzullo and John and Jane Doe police officers, acting individually and in concert deprived Mr. Garcia of his clearly established constitutional right, under the Fifth and Fourteenth Amendments of the United States Constitution, to a fair trial by:

      a.      fabricating inculpatory evidence; and/or

      b.      withholding material exculpatory and impeachment evidence from prosecutors; and/or

      c.      intentionally using unduly suggestive identification procedures and/or direct suggestion and coercion to obtain witness identifications.

114.  The defendants committed these acts under color of state law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Garcia's clearly established constitutional rights.  No reasonable officer in 1991 would have believed this conduct was lawful.

115. As Mr. Garcia has always stated, from the time of his arrest and throughout over

27

sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder. The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was vacated and the indictment dismissed.

116. As a direct and proximate result of defendants' actions Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III
### 42 U.S.C. § 1983 Failure to Intercede
*By Mr. Garcia against Det. Pezzullo and John and Jane Does*

117. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

118. By their conduct and under color of state law, Defendants Pezzullo and John and Jane Doe police officers had opportunities to intercede on behalf of Mr. Garcia to prevent his malicious prosecution and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

119. The defendants' failures to intercede violated Mr. Garcia's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth, Fifth and Fourteenth Amendments. No reasonable police officer in 1991 would have believed that failing to intercede to prevent the defendants from fabricating inculpatory evidence, conducting unduly suggestive identification procedures and/or using direct suggestion and coercion to procure identifications, withholding and/or destroying material, exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Garcia to be arrested and prosecuted

28

without probable cause were lawful.

120.  As Mr. Garcia has always stated, from the time of his arrest and throughout over sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder.  The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was vacated and the indictment dismissed.

121.  As a direct and proximate result of defendants' actions Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT IV
### 42 U.S.C. § 1983 Civil Rights Conspiracy
*By Mr. Garcia against Det. Pezzullo and John and Jane Does*

122.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

123.  Defendants Pezzullo and John and Jane Doe police officers, acting under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Garcia of his clearly established Fourth, Fifth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

124.  In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.      Falsely arresting and imprisoning Mr. Garcia, knowing that they lacked probable cause;

b.      Fabricating inculpatory evidence in reports and pretrial communications

with the prosecution, including the identifications of Mr. Garcia and Mr.
Morillo;

c.    Coercing witnesses to provide false testimony during hearings and trial;

d.    Committing perjury during hearings and trial; and

e.    Intentionally or with deliberate indifference failing to comply with their
duty to disclose *Brady* material during the pendency of the case, including
by destroying material exculpatory evidence.

125.    As Mr. Garcia has always stated, from the time of his arrest and throughout over
sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder.    The
prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was
vacated and the indictment dismissed.

126.    As a direct and proximate result of defendants' actions Mr. Garcia was wrongly
convicted and imprisoned for over sixteen years and suffered the other grievous and continuing
damages and injuries set forth above.

### COUNT V
**42 U.S.C. § 1983 4th and 14th Amendment Deliberate Failure to Investigate
and Fabrication of Evidence by ADA Defendants**
*By Mr. Garcia against Mr. Farber, Mr. Zelenka and Ms. Sugarman*

127.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and
further allege as follows:

128.    Mr. Farber, Mr. Zelenka and Ms. Sugarman intentionally and/or recklessly and in
bad faith, and in a manner that shocks the conscience, fabricated and/or misrepresented the
results of the investigation they did conduct, and/or refused to investigate readily available
evidence of Mr. Garcia's innocence, thereby depriving Mr. Garcia of his clearly established

constitutional rights, under the Fourth, Fifth and Fourteenth Amendments, to be free from unreasonable search and seizure and to a fair trial, due process of law and access to the courts.

129.    Specifically, Mr. Farber and Mr. Zelenka were presented with specific, readily-verifiable evidence of Mr. Garcia's innocence of the Cesar Vasquez murder: certified documents indicating that Mr. Garcia was in jail in the Dominican Republic on the day of the crime. Both Mr. Farber and Mr. Zelenka promised to investigate this alibi, and Mr. Farber contacted the United States State Department, which confirmed Mr. Garcia's alibi. Mr. Farber and Mr. Zelenka then misrepresented and/or fabricated the results of the interactions with the State Department. Even though the State Department had confirmed Mr. Garcia's alibi, Mr. Farber and Mr. Zelenka either failed to conduct any additional investigation and/or misrepresented the exculpatory results of the further investigation they conducted.

130.    Ms. Sugarman, as the supervisor of Mr. Farber and Mr. Zelenka, was aware of Mr. Garcia's alibi claim and the true results of Mr. Farber's and Mr. Zelenka's investigation, and either personally participated in these misrepresentations of the investigation and failure to investigate further and/or directed or approved of Mr. Farber's and Mr. Zelenka's actions and omissions.

131.    Defendants committed these acts under color of state law, intentionally, and with deliberate indifference to Mr. Garcia's clearly established constitutional rights. No reasonable person in 1991 would have believed this conduct was lawful.

132.    As Mr. Garcia has always stated, from the time of his arrest and throughout over sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder. The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was

31

vacated and the indictment dismissed.

133.  As a direct and proximate result of defendants' actions Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI
### 42 U.S.C. § 1983 Civil Rights Conspiracy by ADA Defendants
*By Mr. Garcia against Mr. Farber, Mr. Zelenka and Ms. Sugarman*

134.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

135.  Defendants Farber, Zelenka and Sugarman, acting under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Garcia of his clearly established Fourth, Fifth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

136.  In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.    Fabricating inculpatory evidence, including that Mr. Garcia was not in jail in the Dominican Republic on the day of the crime, as he claimed;

    b.    Making false representations to the court; and

    c.    Intentionally or with deliberate indifference failing to comply with a direct court order to turn over *Brady* material.

137.  Defendants committed these acts under color of state law, intentionally, and with deliberate indifference to Mr. Garcia's clearly established constitutional rights.  No reasonable

person in 1991 would have believed this conduct was lawful.

138. As Mr. Garcia has always stated, from the time of his arrest and throughout over sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder. The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was vacated and the indictment dismissed.

139. As a direct and proximate result of defendants' actions Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII
### 42 U.S.C. § 1983 *Monell*
*By Mr. Garcia against the City of New York*

140. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

141. The City of New York, by and through its final policymakers, maintained a custom, practice and policy of failing to train and supervise its employees at the Bronx County District Attorney's Office on their constitutional obligations to provide criminal defendants with a fair trial, including to disclose exculpatory evidence, to conduct a minimally adequate investigation, not to prosecute without probable cause, not to fabricate evidence, and not to suborn perjury or allow false testimony before the grand jury, at a hearing or at trial to stand uncorrected.

142. These customs, practices and policies of the City of New York were maintained in deliberate indifference to the obvious risk that, absent this training and supervision, Bronx County district attorneys would withhold material favorable evidence, fail to conduct minimally adequate investigations, prosecute without probable cause, fabricate evidence, suborn perjury

and/or allow false testimony to stand uncorrected, and ultimately cause the conviction of innocent people for crimes they did not commit in violation of their constitutional rights.

143.   These customs, policies or practices were the moving force behind the violation of Mr. Garcia's Fourth, Fifth and Fourteenth Amendment rights to be free from unreasonable search and seizure, to a fair trial and not to be deprived of liberty without due process of law.

144.   As Mr. Garcia has always stated, from the time of his arrest and throughout over sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder.  The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was vacated and the indictment dismissed.

145.   As a direct and proximate result of the City of New York's unconstitutional policies, practices and customs, Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VIII
### 42 U.S.C. § 1983 1st and 14th Amendment Loss of Familial Association
*By Jose Garcia, Randy Garcia, Jose Garcia, Jr., and*
*Ana Ortega for Leonidas Garcia and Eli Rivera*
*against all Defendants*

146.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

147.   Randy Garcia, Jose Garcia, Jr., Leonidas Garcia and Eli Rivera have a constitutionally protected liberty interest in the companionship and society of their father, Jose Garcia, and Jose Garcia has a constitutionally protected liberty interest in the companionship and society of his children.

148. Randy Garcia, Jose Garcia, Jr., Leonidas Garcia and Eli Rivera have a fundamental constitutional right to the support, companionship and parenting of their father, Jose Garcia, and Jose Garcia has a fundamental constitutional right to the support and companionship of his children.

149. At the time of Jose Garcia's initial detention, his son Randy Garcia was 3 ½ years old, Jose Garcia, Jr. was 2 years old, Leonidas Garcia was 1 year old, and Eli Rivera was not yet born.

150. The right of a nuclear family to remain together without unwarranted coercive interference by the government is one of the most essential and basic aspects of constitutionally recognized family privacy rights.

151. Through the conduct alleged in the Complaint, Defendants deprived Jose Garcia, Randy Garcia, Jose Garcia, Jr., Leonidas Garcia and Eli Rivera of their fundamental rights, under the First and Fourteenth Amendments, to familial association by falsely accusing, prosecuting, and wrongfully convicting Jose Garcia of a crime he did not commit.

152. Defendants' conduct was purposefully directed at the relationship of Randy Garcia, Jose Garcia, Jr., Leonidas Garcia and Eli Rivera with their father Jose Garcia. Defendants intended – or at a minimum were reckless and deliberately indifferent to the obvious risk – that their conduct would interfere with the constitutionally protected relationship between Randy Garcia, Jose Garcia, Jr., Leonidas Garcia and Eli Rivera and their father Jose Garcia. Specifically, defendants knew that Jose Garcia's alibi was that he was in the Dominican Republic with his family, including his three sons Randy, Jose Jr., and Leonidas, and his pregnant wife Ana Ortega. Defendants further knew that Ana Ortega was active in assisting the

police and prosecutors in the investigation into Mr. Garcia's alibi, including by obtaining

certified documents from the Dominican Republic. Nevertheless, defendants fabricated the

results of their investigation into this alibi.

153. Defendants committed these acts under color of state law, intentionally, and with

deliberate indifference to the clearly established constitutional rights of Jose Garcia, Randy

Garcia, Jose Garcia, Jr., Leonidas Garcia and Eli Rivera. No reasonable person in 1991 would

have believed this conduct was lawful.

154. These acts caused Jose Garcia, Randy Garcia, Jose Garcia, Jr., Leonidas Garcia and

Eli Rivera to suffer the damages set forth above.

### COUNT IX
**State Law False Arrest, Malicious Prosecution, and False Imprisonment**
*By Mr. Garcia against Det. Pezzullo, John and Jane Does and the City of New York*

155. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and

further allege as follows:

156. Defendants Pezzullo and John and Jane Doe police officers, acting within the scope

of their employment of the Defendant City of New York, despite knowing that probable cause

did not exist to arrest and prosecute Mr. Garcia for the Cesar Vazquez murder, intentionally,

recklessly, and with malice caused Mr. Garcia to be arrested, prosecuted, and convicted for the

Cesar Vazquez murder. Furthermore, the defendants intentionally withheld from and

misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against

Mr. Garcia, including but not limited to the facts that Ms. Denor could not independently

identify the actual shooters, that her identifications of Mr. Garcia and Mr. Morillo were the

product of unduly suggestive identification procedures and/or direct suggestion as well as

coercion, that identification procedures with eyewitnesses other than Ms. Denor produced

exculpatory information, and that the police had fabricated inculpatory evidence, and withheld

and/or destroyed exculpatory evidence. The defendants also deliberately failed to conduct a

minimally adequate investigation in light of clear evidence of Mr. Garcia's innocence, as well as

clear evidence pointing to other suspects.

157.  As Mr. Garcia has always stated, from the time of his arrest and throughout over

sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder. The

prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was

vacated and the indictment dismissed.

158.  As a direct and proximate result of defendants' actions Mr. Garcia was wrongly

convicted and imprisoned for over sixteen years and suffered the other grievous and continuing

damages and injuries set forth above.

159.  Defendant City of New York is liable under respondeat superior for these actions of

its employees within the scope of employment.

## Count X
### State Law Intentional or Reckless Infliction of Emotional Distress
*By Mr. Garcia against Det. Pezzullo, John and Jane Does and the City of New York*

160.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and

further allege as follows:

161.  The actions of Defendants Pezzullo and John and Jane Doe police officers in

deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest,

prosecution, and incarceration of Jose Garcia were extreme and outrageous.

162.   As Mr. Garcia has always stated, from the time of his arrest and throughout over sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder.  The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was vacated and the indictment dismissed.

163.   As a direct and proximate result of defendants' actions Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

164.   At all times relevant to this Complaint, Defendants Pezzullo and John and Jane Doe police officers acted as agents of, and in the scope of their employment with, the City of New York.  Defendants' tortious conduct by was undertaken while the defendant officers were on duty, carrying out their routine investigative functions as NYPD detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer.  Indeed, the specific conduct of defendants Pezzullo and John and Jane Doe police officers was known by, should have been known by, and/or was reasonably foreseeable to NYPD supervisors.

165.   Defendant City of New York is liable under respondeat superior for these actions of its employees within the scope of employment.

## COUNT XI
### State Law Negligent Infliction of Emotional Distress
*By Mr. Garcia against Det. Pezzullo, John and Jane Does and the City of New York*

166.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

167.   Defendants Pezzullo and John and Jane Doe police officers negligently and grossly negligently breached their duties owed to him to refrain from fabricating evidence, coercing

witnesses, withholding material exculpatory and impeachment evidence, and otherwise acting to deny him due process of law.

168. As Mr. Garcia has always stated, from the time of his arrest and throughout over sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder. The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was vacated and the indictment dismissed.

169. As a direct and proximate result of defendants' actions Mr. Garcia was falsely arrested, maliciously prosecuted, wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above. Defendants' actions caused Mr. Garcia to suffer physical harm and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

170. At all times relevant to this Complaint, Defendants Pezzullo and John and Jane Doe police officers acted as agents of, and in the scope of their employment with, the City of New York. Defendants' tortious conduct was undertaken while the defendant officers were on duty, carrying out their routine investigative functions as NYPD detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer. Indeed, the specific conduct of defendants Pezzullo and John and Jane Doe police officers was known by, should have been known by, and/or was reasonably foreseeable to NYPD supervisors.

171. Defendant City of New York is liable under respondeat superior for these actions of its employees within the scope of employment.

## COUNT XII
**New York State Constitution**

39

172. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

173. Defendants' conduct, described above, also violated Mr. Garcia's rights under the New York State Constitution, Article I, §§ 6 and 12, to due process of law and to be free from unreasonable searches and seizures.

174. As Mr. Garcia has always stated, from the time of his arrest and throughout over sixteen years of wrongful incarceration, he is innocent of the Cesar Vasquez murder. The prosecution finally terminated in Mr. Garcia's favor on May 18, 2007, when his conviction was vacated and the indictment dismissed.

175. As a direct and proximate result of defendants' actions Mr. Garcia was wrongly convicted and imprisoned for over sixteen years and suffered the other grievous and continuing damages and injuries set forth above.

**WHEREFORE**, Jose Garcia, Randy Garcia, Jose Garcia, Jr., Leonidas Garcia, Eli Rivera, and Ana Ortega pray as follows:

A. That the Court award compensatory damages to them and against the defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to them, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C. For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of their costs,

including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983

claims; and

E.  For any and all other relief to which they may be entitled.

Respectfully submitted,

Peter Neufeld
Nick Brustin (NB0605)
Anna Benvenutti Hoffmann (AH4008)
Cochran Neufeld & Scheck, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081
Attorneys for Plaintiffs Jose Garcia,
Randy Garcia, Jose Garcia, Jr.,
Leonidas Garcia, Eli Rivera and Ana Ortega